UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

MARTIN BISHOP,

              Plaintiff,              CASE NO. 16-CV-01123

      v.                        HON. GEORGE CARAM STEEH

HAMYA, INC., HUSNI HASSAN,
and METROPOLITAN
GOVERNMENT OF NASHVILLE
AND DAVIDSON COUNTY,
TENNESSEE,

              Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANT
HUSNI HASSAN'S MOTION FOR SUMMARY JUDGMENT (Doc. 184)
AND GRANTING DEFENDANT HAMYA, INC.'S MOTION
FOR SUMMARY JUDGMENT (Doc. 183) and
DENYING DEFENDANT HAMYA, INC.'S MOTION FOR SUMMARY
<u>JUDGMENT AS TO CROSS-CLAIMS (Doc. 189) AS MOOT</u>**

      This negligence action based on diversity jurisdiction arises out of an

incident in which Plaintiff Martin Bishop was assaulted by drug dealers, was

struck by a rock, and left unconscious and prone in the middle of the street,

when a tow truck, driven by an employee of Defendant Metropolitan

Government of Nashville and Davidson County, ran him over causing

catastrophic injuries and rendering him a paraplegic.  Metro filed a motion

for summary judgment last summer which this court denied.  Now before

the court are motions for summary judgment by the other two remaining

defendants, Hamya, Inc. ("Hamya") and Husni Hassan ("Hassan") (collectively "Defendants").  Because Defendants owed no duty to protect Plaintiff from the drug dealers who struck him with a rock some quarter of a mile from their property, and because Plaintiff cannot show that the alleged lack of security precautions was the proximate cause of his injuries, and for additional reasons set forth below, Defendants are entitled to summary judgment.

## I.    Factual Background

The court must view the facts and all reasonable inferences from those facts in the light most favorable to the non-moving party, here Plaintiff.  On January 13, 2016, at dusk, Plaintiff and another individual, David Light, were going to visit the Z-Mart convenience store on 24 Lafayette Street in Nashville, Tennessee to buy cigarettes and beer.  (Doc. 125-8 at PgID 1062; Doc. 125-10 at PgID 1184-85).  At the time of the incident, Plaintiff and Light were homeless and lived together in an encampment known as "Tent City" near Fort Negely.  (Doc. 125-8 at PgID 1054, 1058-59, Doc. 125-10 at PgID 1184-85).  According to Light's testimony, the two were also looking to buy marijuana, and Plaintiff was seeking to purchase crack cocaine.  (Doc. 125-8 at PgID 1062-63, 1070, 1084-85).  Plaintiff disputes that he was seeking to buy any drugs.

Hamya leases 24 Lafayette from Hassan and operates a convenience store called Z Mart at that place. (Doc. 142 at ¶ 2, PgID 2127). Hassan owns the property where the Z Mart is located and the adjoining property at 20 Lafayette Street which is the location of a strip mall. (Doc. 142 at ¶ 3, PgID 2128). Hassan leases the property at 20 Lafayette to several small businesses, including Staff Zone. *Id.* Hassan testified that the 20 Lafayette tenants had leases which provided that Hassan was not liable for loss or damage suffered by the tenant or anyone else for the failure to provide security. (Doc. 125-2 at PgID 870-71). Staff Zone closes at five o'clock. (Doc. 125-2 at PgID 832). The two adjoining parcels located at 20 Lafayette Street and 24 Lafayette Street share a single parking lot. (Doc. 125-2 at PgID 851).

According to Light, the two encountered crack dealers three times on the night in question. First, Light testified that when he and Plaintiff arrived at the Z Mart, crack dealers approached Plaintiff by name. (Doc. 125-8 at PgID 1059-60, 1116). Light testified the two then entered the Z Mart and purchased two cans of Natty Ice beer and cigarettes. (Doc. 125-8 at PgID 1062, 1111, 1117). Light testified that after they went to the Z Mart, Plaintiff wanted to approach the drug dealers. (Doc. 125-8 at PgID 1063). Light testified that they encountered them a second time when they left the Z

Mart, but Light persuaded Plaintiff to follow him looking to buy marijuana. (Doc. 125-8 at PgID 1069). According to Light, the two walked around the block, through the housing projects looking for marijuana. (Doc. 125-8 at PgID 1070, 1100-01). Then, Light testified Plaintiff veered back towards the Z Mart and crossed over Lafayette Street towards a female drug dealer in order to buy drugs. (Doc. 125-8 at 1070, 1084-85, 1112-13). At that time, Light testified the two were in the parking lot near the convenience store, Z Mart, and the temporary staffing company known as Staff Zone. (Doc. 125-8 at PgID 1070).

Light further testified that Plaintiff asked the drug dealer how much she wanted for a rock of cocaine:

> Q:    I want you to tell me, as much as you can, about what you remember about the actual conversation between you, Mr. Bishop, and the drug sellers, if you can remember any of that conversation?
>
> A:    I was just kind of standing there beside him. Kind of, you know, right there. Of course when he veered back this way, I walked behind him, with him. I wasn't going to leave him. He asked, okay, how much, what you got. I got 20. The dope dealer, it was a female dope dealer, kind of dykish, blackish woman, from what I could see it was maybe $5 apiece. He said no, I don't want that.

(Doc. 125-8 at PgID 1071). They approached a young black woman who had a rock of cocaine in her hand. Specifically, he testified:

Q. Now when you say the young lady that you said was kind of a butchy black lady, or mixed, she had a rock in her hand, was the rock cocaine that she had?

A. Yes.

Q. And she dropped it onto the ground. Was that because people pulled weapons that she dropped it? Why did she drop it on the ground?

A. She was trying to force Marty [Plaintiff] into buying something that was too small. He didn't want to spend $20 for $5 worth. So she pulled bully, you know. She was like, you're going to buy it, where's your money? Then everybody backed her up.

(Doc. 125-8 at PgID 1085). According to Light, the female drug dealer then dropped the rock of cocaine, and a large number of drug sellers surrounded the two of them with guns, they "started to jump" on Plaintiff, the two then fled down Lafayette Street, while Plaintiff tried to flag cars down. (Doc. 125-8 at PgID 1072, 1085, 1088-89). Light testified that the drug dealers were trying to rob Plaintiff. (Doc. 125-8 at PgID 1090, 1113). After they reached the overpass which was about a quarter mile from the Z Mart, Light testified that one of the drug dealers smashed Plaintiff in the face with a rock, knocking him out, and leaving him prone in the middle of the fast lane of the road. (Doc. 125-8 at PgID 1073, 1106-07). According to Light, Plaintiff was not hurt prior to being hit by the rock, but had just been in a "little bit of tussle." (Doc. 125-8 at PgID1089-90). Light helped the Plaintiff to come to and tried

to get him out of the road when a tow truck hit Plaintiff.  (Doc. 125-8 at 1073-74).

Plaintiff's version of events is quite different.  Plaintiff does not remember ever entering the Z Mart, but he testified that he was approached by four or five individuals who were drinking beer as he was reaching into his pocket for money to purchase beer on his way to the Z Mart.  (Doc. 125-10 at PgID 1194-95, 1202, 1219, 1281).  He testified that a female grabbed his shirt, and he was "hit" as he veered off the sidewalk near the intersection of Staff Zone.  (Doc. 125-10 at PgID 1194-95).  Plaintiff claims that the assault occurred on his way to the Z Mart, when he took a shortcut through the shared parking lot of Defendants' property at 20 Lafayette and 24 Lafayette.  (Doc. 125-10 at PgID 1195)  He also testified that he was not using crack cocaine at the time of the incident, but was using marijuana daily.  (Doc. 125-10 at PgID 1174, 1247).

Plaintiff also testified that he had never gotten drugs from around the Z Mart.  (Doc. 125-10 at PgID 1284).  He further testified that the two went to Z Mart to purchase beer, and that Light was looking for marijuana but never found any.  (Doc. 125-10 at PgID 1185).  Plaintiff testified that he had just sold his motorcycle and was on his way to hike the Appalachian Trial, so the two were going to share a beer before he left on his adventure, and Light

wanted him to buy the beer because Plaintiff had money from selling his bike. (Doc. 125-10 at PgID 1163, 1185, 1192). Plaintiff testified that he did not remember being hit by a rock, but for purposes of the summary judgment motions, does not contest that he was struck with a rock in the head at the overpass of 1-40 and Lafayette. (Doc. 195-1 at ¶ 18, PgID 4188). He contends, however, that the assault began in Defendants' shared parking lot. (Doc. 195-1 at ¶¶ 14, 22, 24 at PgID 4187, 4189, 4190, Doc. 125-10 1195-96). Contrary to Light's testimony that the two were best friends, (Doc. 125-8 at PgID 1054), Plaintiff testified that the two did not have much of a relationship, although they did smoke marijuana together. (Doc. 125-10 at PgID 1277-78).

It is undisputed that Plaintiff has no memory of how he got from the parking lot to the underpass where he was unconscious and hit by the tow truck. (Doc. 194-1 at PgID 4148). At his deposition, Plaintiff circled on a photograph the area where he believed he was assaulted. (Doc. 125-10 at PgID 1209-10). Hamya asserts the area circled is an area owned and operated by solely by Hassan. (Doc. 187 at ¶ 11 at PgID 2904). Plaintiff admits the area identified at his deposition is owned and operated by Hassan, but claims that customers of Z Mart are permitted to use the property at 20 Lafayette as a shared parking lot with other tenants and that

Z Mart controlled the parking lot up to the wall of Staff Zone. (Doc. 195-1 at ¶ 11, PgID 4185).

It is undisputed that a rock and pool of blood were discovered at the underpass about a quarter mile from Z Mart. (Doc. 195-1 at PgId 4190 at ¶ 24). Defendant Hamya asserts that Officer Felipe Pereira viewed Z Mart surveillance camera footage on the night of the incident, determined that no crime took place on Z Mart's property, observed from the surveillance video that Plaintiff and Light walked from the projects behind Z Mart through Hassan's property towards Lafayette Street, observed Plaintiff and Light approaching a black female in a red jacket on Hassan's property, and these three individuals crossed Lafayette Street. (Doc. 187 at ¶¶ 25-30 at PgID 2909-10; Doc. 125112 at PgID 1426-29). Plaintiff, on the other hand, claims the time of the video is incorrect, disputes that Light and Plaintiff are the individuals depicted on the video, disputes that Plaintiff and Light are seen approaching a black female wearing a red jacket, and disputes that the three are recorded in video footage crossing Lafayette Street. (Doc. 195-1 at ¶¶ 25-30 at PgID 4190-4193).

Plaintiff does not dispute that Z Mart is well lit, and that the convenience store uses security cameras with a live feed inside the store. (Doc. 195-1 at ¶ 40 at PgID 4197). It is also undisputed that a Z Mart employee monitors

the live feed from the security cameras, and that there are anti-loitering signs on Z Mart's property. (Doc. 195-1 at ¶ 41 at PgID 4197). There are also anti-loitering and anti-trespassing signs on Hassan's side of the parking lot. (Doc. 125-2 at PgID 852). The manager of the Z Mart at the time of the incident, Sameer Shohatee, has submitted an affidavit which states that Z Mart's security measures are consistent with other gas stations located in Nashville, and that it would be very unusual to employ private security personnel which would create unreasonable and additional security problems. (Doc. 125-6 at ¶9, PgID 977). Shahatee also avers that Metro Police performed nearly daily checks of Z Mart's premises for any suspicious or unsafe conditions. (Doc. 125-6 at ¶ 8, PgID 977). Hamya's security expert, Melvin Brown, noted that police records showed that "Z Mart had an active role in observing and reporting suspected criminal activity to the MNPD." (Doc. 125-18 at PgID 1732). Also, Brown opined that even if Z Mart hired additional security personnel, this would not have prevented the assault once patrons left the Z Mart property as "private employees and/or security personnel are not authorized and should not leave the property under their care. This action is reserved for public law enforcement, not private security or employees." (Doc. 125-18 at PgID 1731).

Plaintiff relies on a security expert, John Villines, who opines that Defendants Hamya and Hassan failed to reasonably address known and foreseeable crime risks. (Doc. 125-16 at PgID 1533). In response to Defendants' motion for summary judgment, Plaintiff also relies on the affidavit of Sergeant Michael Holz, which was submitted in support of the petition for abatement of nuisance, (Doc. 159-3) in which he states that numerous officers complained to Z Mart staff about the excessive amount of crime and calls for service, the selling of alcohol to obviously intoxicated individuals, and the lack of assistance in the prosecution of individuals committing crime on the property. (Doc. 159-3 at PgID 2585-90, 2609).

Detective John Daugherty, who had worked as the zone officer for the Z Mart and Staff Zone, testified that the area at Z Mart and Staff Zone was a high crime area for a myriad of reasons, including the proximity to the homeless mission, the fact that it was a low income area, and that Staff Zone bussed low income workers to jobs and then brought them back to get their paychecks which they would cash at Z Mart. (Doc. 187, Ex. 20 at 15, 22-23). Plaintiff's security expert, John Villines, testified that he reviewed police dispatch reports that documented roughly 15 calls per page for a three-year period from January 2013 to January 2016, but he did not describe with particularity the nature of those calls. (Doc. 125-16 at PgID 1636-37). Also,

Sergeant Holz averred in his affidavit submitted in support of the Abatement Petition filed by the State of Tennessee through the Davidson County District Attorney's Office against Hassan as the owner of Z Mart, that the level of crime at Z Mart was more than twice the level at other similar businesses within a one-mile radius for the same time period.  (Doc. 159-3 at PgID 2540). Also, in his affidavit in support of the Abatement Petition filed against Hassan as the owner of Staff Zone, Holz avers that from January 10, 2010 to January 1, 2017, the Metropolitan Nashville Police Department responded to 1,163 calls to 20 Layette Street, including 454 calls for suspicious person, 21 calls of fight or assault, and 11 calls of robbery.  (Doc. 159-1 at PgID 2480).  There was also anecdotal evidence from law enforcement officers that the area around the Z Mart was a high crime area due to its proximity to the housing projects, homeless mission, and a high drug trafficking area.  (Doc. 196-6 at PgID 4266-69; Doc. 125-12 at PgID 1422).

A brief summary of the procedural history of the motion now pending before the court is in order here.  On May 2, 2018, Defendants Hamya and Hassan filed motions for summary judgment, and the trial was scheduled to begin in October, 2018.  (Doc. 124, 137).  Those motions were denied, and the trial was adjourned, because the court allowed additional discovery and permitted Plaintiff to file an amended complaint based on a July, 2018 press

release announcing the closure of Z Mart based on allegations of public nuisance. (Doc. 157-2, 160, 168, 172). On September 10, 2018, over Defendants' objections, but with leave of court, Plaintiff filed his Third Amended Complaint. (Doc. 169). The amended claims are as follows: Count I alleges negligence against Hassan and Hamya. Specifically, Plaintiff alleges that these Defendants were negligent in the following ways: (1) failing to take proper precautions for safety of Z Mart customers, (2) failing to provide adequate lighting, (3) failing to monitor Z Mart and adjoining property for criminal activity, (4) failing to provide adequate security guards, (5) failure to provide adequate security training to Z Mart employees, (6) failing to conduct adequate security inspections and monitoring, (7) failing to contact law enforcement to report criminal activity, and (8) failing to discourage loitering and criminal activity. Count II alleges governmental tort liability against Metro. Count III alleges negligent attraction of criminal activity against Hamya and Hassan. Count IV alleges Hamya is liable for negligent hiring, training, and supervision of its employees. Count V alleges nuisance against Hassan and Hamya.

Following the filing of the Third Amended Complaint, Z Mart deposed the police officers mentioned in the July, 2018 press release, Detective John Daugherty and Sergeant Michael Hotz. Both testified that the investigation

of Z Mart did not begin until around August, 2017, a year and a half after the incident.  (Doc. 187, Doc. 20 at 9-10, Doc. 21 at 19-20).

After completing additional discovery, Defendants filed renewed motions for summary judgment.  (Doc. 183, 184).  In response to Defendants' renewed motions for summary judgment, Plaintiff alleges that Hassan acted negligently by (1) failing to seek coordination or help from his tenants, (2) by failing to provide for security, (3) by failing to install surveillance cameras, and (4) by failing to obtain a waiver for the police to freely access his property to remove loiterers and people drinking or doing drugs in public.  Plaintiff argues that it would have been feasible and efficacious for Hassan to post a security guard on the premises as he did so for a few months in 2017 for a part of the day, and Detective John Daugherty testified that the guard made some progress in deterring crime.  (Doc. 187, Ex. 20 at 37-38).

The facts are undisputed that Z Mart was well lit, that anti-loitering signs were posted, and that nine surveillance cameras were monitored by a designated employee.  As to Hamya, it is not clear what additional security measures Plaintiff contends it should have utilized, but Plaintiff appears to complain that the employee viewing the live surveillance feed should have been better trained, that it should have provided more cooperation to the police, and it should have hired a security guard.  (Doc. 195 at PgID 4167).

## II.     Standard of Review

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001).  The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice.  The procedure is not a disfavored procedural shortcut.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party.  *Tolan v. Cotton*, 572 U.S. 650, 660 (2014); *Matsushita*

*Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

## III.   Analysis

## A.   Negligence (Count I)

Hamya and Hassan are entitled to summary judgment on Plaintiff's negligence claim because Plaintiff cannot prove that either owed a duty to him for injuries that occurred off premises, and Plaintiff has failed to raise a genuine issue of material fact that their alleged security deficiencies were the proximate cause of Plaintiff being struck by a rock and then hit by a tow truck some quarter of a mile away from the Defendants' property.  Under Tennessee law, in order to establish a prima facie case of negligence, a plaintiff  must prove "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal cause." *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995).

### 1.   Duty

Defendant Hamya argues that it owed no duty to prevent the criminal assault that occurred off its property, and that Plaintiff has failed to demonstrate what additional measures could have been taken to prevent the incident.  Defendant Hassan argues that it owed no duty to Plaintiff as Plaintiff was not its customer and even if he was, any duty ended once

Plaintiff left the premises, and furthermore, Hassan did not violate any reasonable standard of care.

"Duty is the legal obligation a defendant owes to a plaintiff to conform to a reasonable person standard of care in order to protect against unreasonable risks of harm." *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000).  To determine whether a duty is owed in a particular case, the court must engage in a balancing inquiry "to identify whether the risk to plaintiff was unreasonable." *Id.*  The balancing inquiry requires the court to balance whether the "foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm." *Id.* (quoting *McCall*, 913 S.W.2d at 153).

The seminal Tennessee case regarding what duty a premises owner or occupier owes to customers to protect them against the criminal acts of third parties occurring on the premises is *McClung v. Delta Square Ltd. P'ship*, 937 S.W.2d 891 (Tenn. 1996).  In that case, the estate of a Wal-Mart customer who was abducted from a shopping mall parking lot around noon and was subsequently raped and murdered brought a negligence claim against the owner of the mall and the mall's anchor tenant.  *Id.* at 893-94.  The Tennessee Supreme Court grappled with the question of what

duty defendants owed to the plaintiff which the court concluded was "a question of law to be determined by the court." *Id.* at 894. The court announced the general principle that "[a] business ordinarily has no duty to protect customers from the criminal acts of third parties which occur on its premises." *Id.* at 902. The court stressed that the "business is not to be regarded as the insurer of the safety of its customers, and it has no absolute duty to implement security measures for the protection of its customers." *Id.* However, a business may have a duty to take reasonable steps to protect its customers "if the business knows, or has reason to know, either from what has been or should have been observed or from past experience, that criminal acts against its customers on its premises are reasonably foreseeable, either generally or at some particular time." *Id.* In determining whether a duty exists, the court must weigh the foreseeability of the harm against the commensurate burden imposed on the business to protect against that harm. *Id.*

In *McClung*, the court found that based upon detailed crime reports on or in the immediate vicinity of defendants' parking lot immediately before the abduction of plaintiff's wife, including another kidnapping close in time to plaintiff's abduction, the risk of injury to plaintiff's wife was reasonably foreseeable. *Id.* at 904. Thus, the court remanded the case to the trial

court to determine whether a duty existed based on a careful weighing of the burden to be imposed upon defendants and the magnitude of the potential harm. *Id.* The court noted that other nearby major retail centers utilized security measures to protect customers, as did Wal-Marts in other locations. *Id.* The court stated that the burdens to be imposed on the defendant must be balanced against the degree of foreseeable risk, and identified security measures to be imposed might be substantial, presumably hiring security guard(s), or less onerous such as providing additional lighting, signage, or use of surveillance cameras. *Id.* at 902.

This case is distinguishable from *McClung* in several significant respects. First, as to Defendant Hamya, Plaintiff admits that he was not on Hamya's premises, but was in an area of the parking lot owned and operated by Hassan. (Doc. 195-1 at ¶ 11, PgID 4185). Plaintiff argues that *Helton v. Glenn Enter.*, 209 S.W.3d 619 (Tenn. Ct. App. 2006) extended the holding of *McClung* situations where a plaintiff is on property he reasonably believes belongs to the defendant. *Helton* is easily distinguishable. In that case, a motel guest inquired of a desk clerk if his truck and trailer would be safe in an adjoining parking lot, and was assured that it would be. *Id.* at 622. However, there had been numerous recent instances of stolen vehicles at the motel. *Id.* At trial, there was testimony

that the motel had no security guards or outside cameras, and that the

motel could simply have informed guests of the ongoing crime problem and

advised them of where to park. *Id.* at 623. The trial court granted a

directed verdict for the defendant, but the court of appeals found an issue

of fact as to whether the motel had a duty which it breached. *Id.* at 628. By

contrast, in this case, requiring Hamya to police private and public property

off its premises would pose an onerous and undue burden, and would

infringe on the police's jurisdiction. Also, in this case, there is no claim or

evidence that a Hamya employee directed the Plaintiff as was done in

*Helton*.

Likewise, Hassan argues it cannot be liable under *McClung* because

it is undisputed that Plaintiff was never its customer, and unlike the

shopping center where liability depended on how the fact question in that

case was resolved. Here, Hassan is merely the landlord, not the operator

of a shopping center. Plaintiff also argues that Hassan is liable under *Berry

v. Houchens Market of Tenn., Inc.*, 253 S.W.3d 141 (Tenn. Ct. App. 2007)

for the proposition that a landlord is responsible for maintaining common

areas. *Berry* involved a slip and fall and governed the repair and

maintenance of physical property, not securing property from crime by third

parties. Hassan also argues that the evidence shows that Plaintiff was not

injured in the parking lot based on video evidence, some of Plaintiff's own testimony, Plaintiff's own expert, and other evidence. For purposes of deciding this motion, however, the court accepts as true Plaintiff's deposition testimony that a female grabbed his shirt, and he was "hit" in the parking lot. (Doc. 125-10 at PgID 1194-95). Even if true, Hassan had no duty to protect a non-customer/trespasser from the criminal act of a third party.

Plaintiff has not identified any deficiency in security at 20 Lafayette Street property that would have prevented the assault. In fact, Plaintiff's security expert Villines testified that he was not offering an opinion as to specific security measures that Hassan should have taken. (Doc. 125-16 at PgID 1636, 1640). However, Villines also testified that Hassan could have (1) considered coordinating with Hamya to improve their monitoring capability, (2) considered the use of an extra-duty law enforcement officer in the parking lot, and (3) considered signage, landscaping and/or painting, and (4) considered the implementation of a standalone camera system which is actively monitored for immediate response. (Doc. 125-16 at PgID 1650-51). Although these are measures that Hassan might have considered, Plaintiff has come forward with no evidence about the cost or feasibility of these measures. Also, it is undisputed that there were some

surveillance cameras covering the parking lot and some anti-loitering signs. In fact, Plaintiff's expert admitted he had undertaken no cost analysis. (Doc. 125-16 at PgID 1535).  Plaintiff's expert also admitted he had not done any analysis to determine what similar businesses do as it relates to security.  (Doc. 125-16 at PgID 1592).  In essence, Plaintiff argues that Hassan is liable because he owned property in a bad neighborhood and did not provide after-hours security to trespassers.  This is not a sufficient basis upon which to impose a duty under Tennessee case law.

In similar circumstances, the Tennessee Court of Appeals has found no duty where the injury occurred off the business' premises.  In *Chowbay v. Davis*, No. M2001-01838-COA-R3-CV, 2002 WL 1389604 (Tenn. Ct. App. June 27, 2002), for example, a saloon patron threatened plaintiff in the saloon's parking lot, whereupon the saloon's security personnel told the two to "take it somewhere else."  *Id.* at * 1.  The two then left the premises for a vacant parking lot where the assailant, joined by a large group of men, surrounded the plaintiff and physically assaulted him causing serious injury. *Id.* Plaintiff sued the saloon claiming that the bar served his assailant too much alcohol, and failed to protect him from the assault.  *Id.*  The court found the saloon owed plaintiff no duty because the assault took place off defendant's property.  *Id.* at *4.

Similarly, in *Akridge v. Fathom, Inc.*, No. E2014-00711-COA-R9-CV, 2015 WL 97946 (Tenn. Ct. App. Jan. 7, 2015), the court found no duty existed where the plaintiff's injuries occurred off the defendant's premises. In that case, plaintiff was attending a concert at Club Fathom, a business that ministers to at-risk youth, when an altercation erupted inside the building. *Id.* at * 1. Club security shut down the event and evicted all the patrons. *Id.* Once outside the club, plaintiff was caught in the crossfire of a shootout. *Id.* The court found that the club owed no duty to plaintiff, even where the club had a history of violent crime and attracted rival gang members, because plaintiff was no longer on the business premises at the time of the tortious act. *Id.* at *6. So too here.

Second, unlike the premises owner in *McClung* who took no security measures, here Z Mart was well lit, had nine video surveillance cameras whose live feed was audited by a designated employee, and had signage posted against loitering. Plaintiff has not shown that Z Mart's actions to protect patrons from criminal acts of third persons were unreasonable. As to his claims that Z Mart should have had a better relationship with the police, coordinated better with Hassan, should have better trained the employee monitoring the surveillance video, or should have hired a security guard, Plaintiff has not shown that these measures would be cost-effective,

and Hamya's security expert, Melvin Brown, stated that Z Mart's security measures are consistent with other convenience stores/gas stations in the vicinity. (Doc. 125-18 at PgID 1732).

Even if crime was foreseeable in the dangerous area where the Z Mart was located, imposing a duty on Z Mart to prevent an assault on a potential customer located a quarter of a mile away would be an onerous burden. As Hamya's security expert testified, it is unreasonable to expect a security guard to leave the premises to prevent crime. That is a matter left for law enforcement. Also, Hamya's security expert testified that its security measures, which included live monitoring of surveillance cameras and adequate lighting, were consistent with those of similar businesses in the vicinity. As the Tennessee Supreme Court stated in *McClung*, a business is "not to be regarded as the insurer of the safety of its customers, and it has no absolute duty to implement security measures for the protection of its customers." 937 S.W.2d at 902. In sum, neither Hassan nor Hamya had a duty to protect Plaintiff from an assault taking place off their premises, even if Plaintiff first met his assailants in Hassan's parking lot before he was ultimately struck by a rock and run over by a tow truck about a quarter of a mile away.

## 2.    Causation

Defendants also argue they are entitled to summary judgment because Plaintiff has not raised a genuine issue of material fact that their alleged negligence caused Plaintiff's injuries.  "[N]o negligence claim can succeed unless the plaintiff can first prove that the defendant's conduct was the cause in fact of the plaintiff's loss." *Waste Mgmt.*, *Inc. of Tennessee v. S. Cent. Bell Tel. Co.*, 15 S.W.3d 425, 430 (Tenn. Ct. App. 1997).  Once actual causation is established, the court considers whether proximate cause exists. The Tennessee Supreme Court has set out a three-prong test for assessing proximate causation:

> (1) The tortfeasor's conduct must have been a "substantial factor" in bringing about the harm being complained of; and (2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and (3) the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence.

*McClenham v. Cooley*, 806 S.W.2d 767, 775 (1991).  "[P]roximate cause is a jury question unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome."  *Id.*

The proximate cause question asks whether the defendant's conduct is closely enough tied to the injury that it makes sense to hold the defendant legally responsible for the injury. W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on Law of Torts* § 42 (5th ed. 1984). Proximate cause is "said to depend on whether the conduct has been so significant and important a cause that the defendant should be legally responsible." *Id.* It is a question of "whether the duty includes protection against such consequences." *Id.* The Supreme Court has observed that "[p]roximate cause is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct." *Paroline v. United States*, 572 U.S. 434, 445 (2014). "A requirement of proximate cause thus serves, *inter alia*, to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." *Id.* Such is the situation here. Plaintiff's catastrophic injuries are too remote from the alleged security deficiencies to hold these business owners liable.

Hamya argues that Plaintiff has not provided any explanation or proof, through its security expert, or otherwise, what Z Mart could have done differently to prevent the assault. Plaintiff responds that if Z Mart kept the individuals who later assaulted him off their property, he would not have

been injured.  Plaintiff has not raised a genuine issue of material fact that Hamya's security measures were unreasonable or were the proximate cause of his injuries.  He was struck in the head some quarter of a mile away from the Z Mart, clearly far outside the bounds of Z Mart's ability to provide security for its customers.  Moreover, Plaintiff was not Z Mart's customer at the time of the assault.  He admits he was in Hassan's parking lot when he was first approached by the drug dealers who followed him down the road to the overpass where he was struck, first by a rock, and then by a tow truck.

Similarly, Plaintiff has not shown that Hassan's failure to prevent persons from loitering on his property after-hours caused Plaintiff's injuries. The chain of causation in this case is too attenuated and the injury too remote.  Here, the fact that Plaintiff may have first encountered some of the persons, allegedly drug dealers, in the parking lot does not make it reasonably foreseeable that these individuals, and others who joined the group later, would eventually follow Plaintiff down the street for a quarter of a mile, before he was struck in the head with a rock, left unconscious on the highway, and run over by a tow truck.  The alleged security deficiencies here cannot be found to be substantial factors in the catastrophic car accident which ensued, nor could Plaintiff's injuries suffered when he was

run over by a tow truck have been reasonably foreseen because drug dealers loitered in a parking lot.  For these reasons, Defendants Hamya and Hassan are entitled to summary judgment on the negligence claim.

**B.    Negligent Attraction of Criminal Activity (Count III)**

In addition to his negligence claim, Plaintiff also avers as separate counts, negligent attraction of criminal activity (Count III).  For the same reasons Defendants are entitled to summary judgment on Plaintiff's negligence claim, Defendants are also entitled to summary judgment on the claim for negligent attraction of criminal activity which must be analyzed under the same standards.  *McClung*, 937 S.W.2d at 902.

**C.    Negligent Training, Hiring and Supervision (Count IV)**

Plaintiff also alleges negligent hiring, training, and supervision (Count IV) against Defendant Hamya only.  In order to recover for negligent hiring or supervision, Plaintiff must establish all the elements of negligence, plus evidence that the employer had knowledge of the employee's unfitness for the job.  *Doe v. Catholic Bishop for Diocese of Memphis*, 306 S.W.3d 712, 717 (Tenn. Ct. App. 2008).  Plaintiff argues Hamya should have hired employees with security training or hired outside contractors, should have tasked employees other than the employee assigned the duty of monitoring the surveillance cameras with security duties, and should have conducted

background checks on its employees.  Plaintiff also criticizes Hamya for allegedly failing to train its manager, Sameer Shohatee, in security. Plaintiff has failed to raise a genuine issue of material fact.  Even if Hamya's employees could have been better trained in security matters in general, Plaintiff has failed to show that any Z Mart employee was involved in the incident at issue here, or that better or different training and supervision would have prevented Plaintiff's assault some quarter of a mile away from the Z Mart.

## D.    Nuisance (Count V)

Finally, the court considers Plaintiff's claim for nuisance against both Defendants Hamya and Hassan pled in Count V.  "A public nuisance is an act or omission that unreasonably interferes with or obstructs rights common to the public good."  *Wayne Cty. v. Tenn. Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 283 (Tenn. Ct. App. 1988) (citing *Metropolitan Gov't of Nashville v. Counts*, 541 S.W.3d 133, 138 (Tenn. 1976)); *see* Restatement (Second) of Torts § 821B (1977).   But claims against property owners for the alleged maintenance of a dangerous condition should apply ordinary principles of negligence.  *See Counts*, 541 S.W.2d at 139.

As Hassan aptly points out in its brief, the modern balancing test established in *McClung* governing negligence claims, not the standards relating to common law public nuisance claims, applies here. *See* Tennessee Pattern Jury Instruction § 9.13 (USE NOTE) (instructing that nuisance actions involving injuries suffered on a defendant's premises should use the general negligence instruction § 9.01).

Even if Plaintiff could proceed under a nuisance theory and demonstrate the existence of criminal conduct on the property, Plaintiff must demonstrate that the alleged nuisance was the proximate cause of his injury. *See Memphis Light, Gas & Water Div. v. Goss*, 494 S.W.2d 766, 769 (Tenn. 1973). For the reasons discussed previously regarding Plaintiff's negligence claim, Plaintiff has not shown any nexus between the operation of Z Mart or Hassan's parking lot and Plaintiff's injuries. Accordingly, Defendants are entitled to summary judgment on Plaintiff's nuisance claim.

E. **Hamya's Motion for Summary Judgment as to Hassan**

Hamya also seeks summary judgment of Hassan's cross-claim for indemnification. (Doc. 189). Having found that Hamya and Hassan are entitled to summary judgment, Hamya's motion for summary judgment as to Hassan's cross-claim for indemnification shall be denied as moot.

### V.    Conclusion

For the reasons set forth above, Defendant Hamya's and Hassan's motions for summary judgment (Doc. 183 and 184) are GRANTED.

IT IS FURTHER ORDERED that Defendant Hamya's motion for summary judgment as to the cross-claim filed by Hassan (Doc. 189) is DENIED AS MOOT.

**IT IS SO ORDERED**.

Dated:  April 24, 2019

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE